# EXHIBIT A

# AFFIDAVIT OF SPECIAL AGENT DAVID X. O'NEILL

I, Special Agent David X. O'Neill, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twenty years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

> $44,000 in United States currency seized from Tian Ping Huang on February 18, 2016, at Boston Logan International Airport (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to

establish probable cause for forfeiture of the Currency.

5.   This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

6.   As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

**The Seizure of the Currency**

7.   On February 18, 2016, Transportation Security Administration ("TSA") agents assigned to Terminal B (United Airlines Checkpoint) at Logan Airport located in Boston, Massachusetts, requested assistance from LATF agents. TSA agents advised that a passenger, later identified as Tian Ping Huang ("Huang"), attempted to pass through the TSA checkpoint with what appeared to be a large amount of currency in his black backpack.

8.   LATF agents, including MSP Trooper Steven McDonald ("Trooper McDonald"), MPS Trooper Christopher Fraser ("Trooper Fraser"), and I (collectively, the "investigators"), responded to TSA's request in order to investigate further. When we arrived, we were directed to Huang, as well as a large bundle of currency, which TSA found in Huang's backpack. Trooper McDonald inspected the currency and immediately noticed a strong odor of marijuana

2

emanating from it. Other investigators also noticed the strong odor of marijuana emanating from the currency.

9. We identified ourselves to Huang and explained that he was not under arrest, that he was not obligated to speak to us, and that he was free to leave at any time. Huang acknowledged that he understood. Huang was then asked questions regarding his travel plans and the large amount of currency found in his backpack. Huang responded that he was traveling to Sacramento, California, to purchase a house. He also told us that he only had $20,000 in United States currency in his backpack.

10. Huang told us that he currently lives at 2293 66th Street, Sacramento, California, and that he traveled to Boston four days earlier to visit his parents who live in Quincy, Massachusetts. Huang stated that he stayed with his parents during his entire visit to Massachusetts and indicated that he took a cab from Logan Airport to Quincy when he arrived. Investigators then asked Huang for his parents' address in Quincy, Massachusetts. Huang was not able to provide either a house number or a street name. Huang was also unable to explain how he was able to direct a cab to his parents' house, without knowing their address.

11. After receiving Huang's permission to perform another inspection of the backpack, investigators looked in Huang's backpack and discovered an additional bundle of currency. When investigators asked Huang about the additional bundle, he was unable to provide an explanation. Later, investigators counted the currency and determined that there was approximately $44,000 in United States currency in the backpack. Investigators asked Huang why he provided them with an inaccurate amount of currency, and Huang stated that he was uncertain of the total amount of cash that his parents had given him.

12. Huang then told us that the Currency was given to him by his parents, Yan Quing Li ("Li") and Wet Huang ("Wet"), as a gift for a down payment on the house he wanted to purchase in Sacramento, California. When asked questions regarding his parents, Huang was only able to provide very limited information (*i.e.*, their telephone numbers and their names). We also asked Huang about his parents' professions and the source of the Currency. Huang told us that his parents were currently unemployed. He added that it is not unusual for "Chinese people" to have large amounts of cash "on hand." Huang then stated that his father was, at some point, the owner of a business called HNL Construction located in Brooklyn, New York. When investigators asked additional questions regarding the company, Huang admitted that the company went out of business approximately one year ago because of a declining customer base and that his parents had been unemployed since the company went out of business. Huang also did not know whether his parents acquired any debt as a result of the company going out of business.

13. After receiving this information, MSP Trooper Fraser conducted an internet search to obtain additional information regarding the company. Based on information received from www.findthecompany.com, HNL Construction Company is an active business specializing in single family housing construction and is located in Brooklyn, New York. According to the company's website www.hnlconstruction.net, the company earns an annual revenue of $140,000, has two employees, and was established in 2012. Trooper Fraser contacted the company and spoke with an individual who identified himself as Patrick Last Name Unknown ("LNU"). Patrick confirmed that the business is active and has never gone out of business. Patrick also stated that he had never heard the name Wet or Li.

14. Investigators also inquired about the house that Huang claimed he was planning to purchase. Huang was unable to provide the house number or the street where the property was located. Additionally, Huang was unable to provide a description of the property (*i.e.,* whether the house was a colonial or ranch style house), and then admitted that he did not know the style of the house. He also did not know other details about the house, and at one point said "I think it has a red roof." Due to Huang's inability to provide details regarding the house, investigators inquired as to whether Huang actually visited the property, and Huang stated that he did.

15. Investigators asked Huang the purchase price of the property, and Huang responded that it was $180,000 and that he had already obtained a mortgage. Huang was unable to provide the name of the lender nor the amount that the lender agreed to loan him for the purchase of the property. Huang stated that he was planning to make a cash payment of $80,000 and also showed investigators banking documents reflecting that he had an additional $70,000 in his personal savings account. Collectively, these two amounts totaled over two-thirds of the alleged purchase price of the property. Given that Huang stated he was planning to give such a high cash deposit, investigators continued to ask Huang questions. In response, Huang gave investigators a copy of a loan application from Freddie Mac/Fannie Mae, which was dated January 27, 2016. The loan application included the amount requested to be borrowed, $108,000, and also included a down payment of $80,000. The loan application also included the address of a property: 2050 Kirk Way, Sacramento, California (the "Kirk Way Property"). The loan application did not appear to be processed nor did the application include loan origination information. When investigators asked whether the application had ever been processed, Huang admitted that the application had never been submitted. Huang was also unable to provide investigators the closing date for the purchase of the house. Despite this,

Huang insisted that the Kirk Way Property was the same property he was planning to purchase but that he had obtained financing from a different financial institution. Investigators then asked Huang about the type of mortgage he was going to receive and the payment conditions, and Huang was unable to answer any of these questions nor was he able to explain why he was required to provide a large cash down payment. Based on my training and experience, I am aware that individuals involved in bulk cash smuggling and drug trafficking often will ensure fake documents as props to help disguise the true origination of the cash being smuggled. Based on Huang's inconsistent statements and lack of knowledge relating to the property, I believe that the loan application was used as a mechanism to mask law enforcement detection and to hide the true origin of the Currency.

16. Investigators asked Huang one last time for the financial institution's information. Huang then responded that the lender was an "insurance company," the name of which he could not recall, but then he provided information for "Steven" LNU and his phone number. Huang noted that Steven was the individual who processed his mortgage.

17. Investigators asked Huang if he had a bank account and why he withdrew the Currency before traveling to California to purchase the property. Huang responded that he had a bank account and directed investigators' attention to a JP Morgan Chase bank receipt, which showed a balance of $57,065.82. Huang also told investigators that he did not deposit the cash because of tax reasons stating, "It's better for taxes if you don't." Investigators thought it was strange that Huang had not mentioned the large deposit previously during the conversation. It was clear that Huang wanted investigators to believe that he was carrying the large amount of cash for tax reasons, but this was inconsistent with Huang's own actions as discussed *__supra__* (*See* Paragraph 30).

18. Based on Huang's inconsistent statements, Huang was asked to accompany us to the Massachusetts State Police Troop F Barracks (the "Barracks") to speak with us further about his travel plans and the Currency. Huang initially agreed then changed his mind shortly thereafter. After being reassured that he was not under arrest, not obligated to speak with us, and was free to leave, Huang agreed to accompany us to the Barracks.

19. During this time, we noticed that Huang had two cell phones. When we asked about the two cell phones, Huang stated that one belonged to him and that the other belonged to his wife, Huiying Man ("Man"). Huang then reported that he was traveling with Man and that she had walked to the gate. Huang attempted to call her, and while he was doing this, investigators asked him how he was able to call her if Huang had her cell phone. Huang did not respond. When asked if Man knew about the Currency, Huang stated, "No, she would spend it."

20. After receiving this information, investigators located Man and asked permission to speak with her. According to Man, she arrived in Boston on February 16, 2016, with Huang. They spent one night in Quincy, and one night in New York. Man also stated that she knew that Huang was carrying "about $40,000.00." Man then told investigators that Huang's uncle handed Huang the Currency at a house in Quincy. However, Man was not able to provide the uncle's name nor the address of the house in Quincy. When asked about Huang's two cell phones, Man stated that Huang had two phones – one was his "business" phone and the other was his "personal" phone. She denied owning either of the phones.

21. Investigators also asked Man about the Currency, and Man stated that the Currency was to be used to purchase the Kirk Way Property.

7

22. After receiving this information from Man, investigators continued their conversation with Huang. During the conversation, Huang admitted that both cell phones belonged to him. Based on my training and experience, I am aware that individuals who are engaged in drug trafficking often use multiple cell phones in order to avoid law enforcement detection. Based on my training and experience and observations during the course of this investigation, I believe that Huang's "business" phone is used for the purpose of drug trafficking.

23. Huang also stated that his father handed him the Currency. When investigators confronted Huang regarding the discrepancies between his story and his wife's story, Huang changed his previous statement and then claimed that both of his parents and his uncle gave him the Currency. He then added that three uncles gave him the Currency and provided the following names: Kim Fa Tan, Ming Hui Tan, and Song Hui Tan. However, he was unable to provide the ages, dates of birth, addresses, or phone numbers for his uncles. When asked about his stay in New York, Huang admitted that he did not stay in Quincy for four nights as he originally had reported and admitted to staying one night at the Leon Hotel in New York. Up to this point, Huang was unable to provide his parents' address or the address of the house he was purchasing in California. However, he was able to rattle off the address of the hotel in New York from memory.

24. Investigators then told Haung that the Currency was going to be examined by a MSP drug detection K-9 at the Barracks. Investigators invited Huang to the Barracks, but Huang declined and stated that he wanted to continue his travels.

25. Subsequently, the Currency was transported to the Barracks. Trooper Fraser arranged for MSP Trooper Brian Bonia ("Trooper Bonia") and his K-9 Maximus ("Maximus") to examine the Currency and to perform a narcotics scan. Trooper Bonia has been employed by

the MSP for 12 years and has been assigned to the canine unit since March of 2008. Maximus is a 9-year old German Shepherd. Trooper Bonia uses Maximus in the detection of controlled substances in different situations, including interdiction investigations. In October of 2008, Trooper Bonia and Maximus attended and successfully completed a 320-hour course in narcotics detection through the New England State Police Administrator's Conference ("NESPAC"). As a result, Maximus is certified to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Bonia and Maximus attend recertification on a yearly basis. Their most recent certification was completed on November 11, 2015. Since the initial NESPAC accreditation course, Trooper Bonia and Maximus have maintained their training at a minimum of 16 hours per month. Searches conducted by Maximus have led to the seizure of marijuana, cocaine, heroin, and methamphetamine.

26. Trooper Fraser placed the Currency in a randomly selected location within the interior of the large garage bay at the Barracks, which contains lockers, storage bins, motor vehicles, and maritime equipment. Within seconds of releasing Maximus, Trooper Bonia advised that Maximus had a positive alert to the location where the Currency was hidden and to the Currency, indicating the presence of narcotics odor. Trooper McDonald and Trooper Fraser then processed and secured the Currency. The Currency was then counted. The Currency was made up of the following denominations: 100 $100s, 200 $50s, 300 $10s, and 200 $5s.

27. After the Currency was processed, on February 18, 2016, I conducted research in an attempt to verify the information Huang provided regarding the "insurance company" handling the closing of the property. I contacted Steven Tse ("Tse"), a real estate agent for Keller Williams located in Elk Grove, California. Tse indicated that Huang was, in fact, a former client and explained that Huang did not purchase a house through him nor did Huang ever

secure a mortgage for the property located at 2050 Kirk Way.  Tse also stated that Huang informed him approximately three to four weeks earlier that he was no longer interested in purchasing the 2050 Kirk Way property because Huang was planning to move to Boston.

28.   On or about February 18, 2016, Trooper Fraser also contacted Li, Huang's stepmother.  Li communicated that she spoke limited English, but that her daughter, Mandy Huang ("Mandy"), was able to translate for her.  Li explained that Huang was her step-son and that she had not seen him in over ten years.  Mandy also stated that she had not seen Huang in over three years and that she and her parents live at 273 Billings Road in Quincy, Massachusetts.

29.   Additionally, based on a review of Huang's account statements, on February 18, 2016, at 8:28 a.m., Huang deposited $57,000 in United States currency into his account from the Chinatown branch location in Boston.  Based on my training and experience, a common tactic utilized by individuals involved in drug trafficking is to deposit unspecified sums of cash into an account, then withdraw the currency shortly thereafter, in order to provide, on demand, "legitimate banking documents" showing that the funds were withdrawn from an account.

## CONCLUSION

30. Based on the information provided above, I have probable cause to believe that the Currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846. Accordingly, the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

Signed under the pains and penalties of perjury, this 29th day of July 2016.

_____
David X. O'Neill, Special Agent
United States Drug Enforcement Administration